I believe you've answered the court's questions. Thank you counsel. We will take this matter Thank you. You, if you're ready to proceed, Attorney Fields. Thank you. May it please the court. My name is Daryl Fields and I represent the appellate, Wayne Morgan. I'd like to begin with point two, which concerns the application of the attempted murder guideline in this case. We argue that this case did not show that Wayne Morgan acted with premeditation and deliberation, the intent necessary for first degree murder when he will be a victim too. That the evidence is more consistent with him having acted under conditions of a sudden crawl or in the heat of passion, which would be a manslaughter and fall under guideline section 282.2, which has a base offense level of 14. So how do you account for the telephone conversations that I think were either two or three weeks later and he's talking about what he did and at the very least it clarifies his intent. No, Your Honor, because for first degree murder, he would need to have acted with premeditation, which means he had to not only have acted with a cool head that was capable of reflection at the time, but there also had to be some appreciable time for him to reflect and consider what he was doing. So isn't that appreciable time depicted in the video that shows that after the interaction, he went inside an apartment, retrieved a gun from the co-defendant, waited, went inside, retrieved a gun, came out, went out a different exit so as not to presumably be detected. I mean, intent can be formed. Typically, jurors are instructed generally two things. Intent can be formed in a murder case or attempted murder instantly. And two, it can be derived from circumstantial evidence. We instruct jurors that you can't get into someone's mind and therein determine their intent and that you do so by circumstantial evidence. So isn't the circumstantial evidence in this case very strong to show that your client took the time to go and retrieve a gun and to hide it and to come out a different exit and to confront and then chase one of the victims while shooting him in the back? I mean, how is that not? No, Your Honor, because this isn't – that may be enough for second-degree murder. But for this guideline, you have to establish first-degree murder. Why is that? Because that's what the guideline provides. It's first-degree murder, which is 18 U.S.C. 1111. And that requires premeditation. The video evidence is just three minutes long. It's just three minutes from start to finish. And the judge broke it down frame by frame. But if this were a manslaughter, which we say it is, where a person acts on a sudden quarrel or he's – the same could be said. Section 1111 is not a first-degree murder statute. It's a murder statute. It says murder is the unlawful killing of a human being with malice aforethought. Then it goes on to talk about every murder that is deliberate and premeditated is first-degree. All other murder is second-degree. This is classic common law murder. Malice aforethought doesn't mean aforethought. That was established in, like, the 12th century. Premeditation comes into play in, like, the 18th century. And by the end of the 19th century, you have judges saying that no time is too short for an evil man to premeditate. And so that whole distinction starts to break down. But whatever way it is, intentional killing, not qualifying for the manslaughter defense, is murder. And premeditated, whatever that means, is first-degree murder. Here, at least, it's second-degree murder. There's no question. Premeditation does mean something. The guidelines provide this guy to be first-degree murder for the base office level, to be 33. And there is premeditation. There has to be some appreciable time. Three minutes is not an appreciable time to think, I'm going to kill this guy. I'm going to – how am I going to do it? I'm going to go to my friend's apartment and borrow his gun. Why isn't that a plan? That's the same thing as if he – It's not quite the same thing as the guy says, suck my dick. And you think, oh, my God, he really means he's going to sexually assault me, whip out the gun from my pocket and shoot him. That, conceivably, is manslaughter. He didn't do that. He did something very close. He went to – the co-defendant lived on the first floor of the apartment. He walked a few steps to the front of the building to the co-defendant's apartment. And when the co-defendant answered the door, I don't know what he talked about, but he went inside. But everything happens within three minutes, three minutes from him leaving the front of the building, knocking on the co-defendant's door. And then when he goes outside, he doesn't immediately shoot the person, victim two. He's warping himself up because he's agitated. He's in this agitated state. And he, only after a few seconds, then he starts to fire. And it looks like he shot victim one unintentionally because that's the co-defendant's nephew, the co-defendant who supplied the gun and loaded the gun for him. But this happens in a very short period of time. Mr. Morgan is very mentally ill. And his condition was exacerbated because this was the beginning of the pandemic, the first five months. He couldn't, he stopped getting his medication. All his treatments stopped. He had no in-person treatment. All he did was get phone calls telling him to self-isolate. So in that time, there's a three-minute period where he snapped. There's no evidence of him doing anything before that three minutes. There was some evidence that he had concerns about these two individuals, particularly the victim that he chased and ultimately shot in the back, that prior to this date, he had concerns that they may, that he may sexually assault him. And undoubtedly, your client had, unfortunately, a very terrible history of being a victim himself and mental illness. All of that may explain why things occurred the way they did that day, COVID, et cetera. But there was, he was already sort of concerned about these two individuals and the one individual in particular because of some interaction they had previously. Or am I misreading the record on that? No. He apparently did have some concerns. I think that's what comes out in some of the, in a couple of the phone calls. But there's no evidence he planned anything with COVID for a while. Well, I guess what I, I mean, we are, we are, I mean, I personally would find premeditation on these facts, at least based on the cold record, which is thankfully not my job. My job here is to decide whether there was sufficient evidence to justify the district court in finding by a preponderance of the evidence that there was premeditation. Now, do you, have you cited any case in which it was held under Section 1111 that a jury was not permitted to find premeditation beyond a reasonable doubt because the time for premeditation was only three minutes? This is the time not for the premeditation. This is the entire event happened within three minutes. He knocked on the COVID fitness door for one minute and was in there for about, for about a minute. So it's a couple of minutes, but it happens very fast. If, if he just, if a person just snaps in a quarrel and has a quarrel with someone and he had a passion, acts on it, he doesn't have a gun himself, but he knows the guy a few steps away who has a gun. And he acts and he does all this within, and the time just lasts three minutes, just takes three minutes. Yeah. So my question is, in a case like, do you have a case like that where it was held that that is insufficient time for premeditation when the question is, could a jury find it beyond a reasonable doubt, let alone could a judge find it by a preponderance of the evidence? No, I haven't looked for such a case. Yeah, well, I think you will find them and I think you'll find them saying the opposite because that was what premeditation came to mean over the course of time. I mean, what you're, what you're looking at in the federal statute for first degree murder is an antiquated concept, but it's one that is still applicable in many states. And there are people going to the death penalty on findings of premeditation that are no stronger than this. But this case is like a person pulling a gun out of his pants pocket because he's just walking from the front of the building to the apartment of the co-defendant who is very close by. But I think the point, the point of those cases, for example, in self-defense, you know, you have, you don't have self-defense, which is in essence what he's claiming here, self-defense from a perception that he's going to be sexually assaulted. No, he doesn't have self-defense. But in self-defense cases, in some states, you have the duty to retreat. And if you leave, you have the mindset to think this is a bad idea. Okay, I'm mad I'm going to get a gun, but this is a bad idea. You don't go forward and get the gun and wrap it in a T-shirt and run out, come out the building from a different door to surprise the people that you are frightened of or scared of and then shoot them in the back. I mean, these are all things that go to intent. Yes, Your Honor, we argue that the evidence shows that his intent was more like a voluntary manslaughter. I'll briefly, can I briefly speak about the amended indictment issue? This is an unusual case in the sense that not only the initial indictment that was filed and the superseding indictment both give a date of March 8, 2020, when this incident occurred. The indictment was amended by the government during the precincts report by saying that the incident occurred on August 31, 2020. What was the prejudice? The prejudice would be that it's unclear from the record that what happened on August 31, 2020, which is what the attempted murder is based on, videotapes taken August 31st. It's unclear whether, from the record, whether what the grand jury voted on is occurring on March 8th. It's unclear from the record. The prejudice is it's unclear that that's, that we're out on August 31st is related to the conviction, to the count the grand jury filed against Mr. Morgan from March 8th, 2020. How is it unclear when they referenced the shooting in the allocution? Unless your client was charged with some other shooting. How is it unclear? I mean, I understand it is troubling that the complaint had the correct date and then there is an indictment that has the wrong date. I get that. And those are good questions for your opposing counsel. How could you get it wrong and get it wrong twice? But certainly by sentencing, that's when the government said, oh, you know, that March date is wrong. It's really August. But in terms of the allocution, when your client actually pled guilty and there was a reference to the shooting, are you saying he didn't know that the possession, that what he was pleading to, possession of ammunition, was related to, not related to this incident, to the shooting? When they talked about the shooting and the victims and what happened? I'm saying that the record is unclear. When he pled guilty, he just pled guilty, he just says, in March 2020 in the Bronx, I had ammunition and I was previously convicted, convicted felon. And I know I have, I know having ammunition is wrong and I'm sorry for it. So let me try and clarify. The Pimentel letter didn't have a date on it. But the Pimentel letter described what had happened. And I think his counsel confirmed that he'd been given a copy of it and read it. It was clear that he had access to it. So he knew then at the time of his plea and sentencing that what he was in the dock for was the shooting. Yes. The Pimentel letter isn't a pleading. It's just the government's position about what the guideline range would be. It's not a plea agreement. It's not a pleading. The thing that's so unusual about this case. Is it your position that he, in entering this plea, could possibly have thought that he was pleading to an incident that happened in March as opposed to August? The record isn't clear on what he thinks. He's pleading guilty if something happens in March 8th, 2020. When apparently the only thing that happened that I know of in this case happened on August 31st. But what I believe is not by record. There were two pleadings. Two grand juries came up with this March 8th, 2020 date. And it's not like the typographical error like in the pre-sentence report is a typographical error. It says January 2021 when it's January 2022. But this isn't. Are you arguing the effective reallocution? Are you arguing constructive amendment? Are you arguing both? I'm arguing that the indictment was amended. And if you are going to sentence or prosecute him for August 31st, 2020, then the record is not clear that he knew what he was doing. Well, normally when you have a constructive amendment, you are comparing the proof or in the case of a plea, what the plea is to with the indictment, with the charging instrument. Right. But here the proof in the form of the allocution matches the indictment. Yes. He's charged with possessing ammunition on March the 8th, and he admits to possessing the ammunition in March. Right. So what follows from that? If he pled guilty to what is charged in the indictment, then there isn't any constructive amendment of the indictment. Well, there is a constructive amendment, we argue, because the indictment is then amended, amended at the time of the preparation. Well, the government says, oh, no, we meant August 31st. So now the August whatever. So now is what we're actually saying, that the shooting is not relevant conduct to the crime that he pled guilty to, which is some mysterious time when he actually did possess ammunition in March. Of course, it would still be something the Court could consider at sentencing even under that scenario, only it wouldn't go into the guidelines, it would go into 3553A factors. But, yes, the argument is that the record doesn't make clear that what happened on August 31, 2020, is relevant conduct to whatever two grand juries, two sets of grand juries, voted him, charged him. So that's the prejudice. That's the answer to Judge Parker's original question. Yes, that being prejudice. And that would entitle you to a resentencing at which the Court could consider this shooting under the 3553A factors rather than as relevant conduct. No, you'd have to vacate the conviction. Well, why is that if he pled guilty to what he was charged with? Because the — it's unclear that his guilty plea was knowingly involuntary, because he's pleaded guilty to something on a date that's not reasonably near. March 8, 2020 is not reasonably near August 31, 2020. The client is not even mentally ill. Well, that's a whole separate question, actually, whether that's just on or about. We're indulging the assumption that it is not, and that, therefore, the — we have to look through this at a lens which says, if he had said, Judge, I don't know anything about March, but in August I shot a guy, and I think that's what the government actually means. And the judge said, good enough for government work. That's on or about March. Well, that's a whole separate question, actually, whether that's just on or about March. We have to look through this at a lens which says, if he had said, I don't know anything about March, but in August I shot a guy, and I think that's what the government actually means. And the judge said, good enough for government work.  We have to look through this at a lens which says, good enough for government work. And then he's indicted for that. And somehow they maybe deliberately tried to conflate that with the shooting incident. I don't know. We have no idea. You're the one who's assuming exactly what everybody else is assuming, that they meant the August incident. And if they meant the August incident, then we have a whole different set of issues. And if we were to remand counsel to order vacating the plea, your client presumably could be charged with attempted murder on the correct date. No, because it wouldn't be a federal crime. Well, I guess, yeah. He's thought to be charged with possession of a weapon. Well, yeah, he would be able to be charged with not attempted murder, but with whatever you could charge him. You're right, Your Honor. Excuse me. You're right. I do assume it was a mistake. The problem is what I assume is just not part of the record. You just have this record that I've never seen anything like this before. And March 8th is not any date. That's a week. That's a Sunday before the national emergency. Counsel, counsel, the complaint had the correct date, right? When he was first arrested on a complaint, it had the correct date, correct? The complaint had the correct date. He understood he was being arrested and charged in connection with this crime that occurred on August, in August, correct? Yeah, the record would indicate that. So it's not a situation where he is charged by indictment, pleads guilty to something in March, and no one's ever mentioned, hey, you're being arrested. This is what you're being charged with in connection with this incident, correct? But the pleadings are the grand jury indictments. The indictment comes down 10 days later, 11 days later, and it changes the date. Yeah, one set of grand jurors in October of 2020 come up with this March 8th date. It's October 13th. October. What did I say, March? No, no, I'm sorry. October 13th. Yeah, October 13th. And then in February, the super scene doesn't. But these are two separate grand juries, and they died him for something on March 8th, 2020. I'm just saying that on this record, a record I've never seen before, anything like this, there's a, it doesn't show that whatever he was indicted for on March 8th, whatever those grand juries, two sets of grand juries he was indicted for, is the same thing as August 31st, 2020. And we are, we are playing her because counsel didn't object, didn't contest it, because probably made the same assumption we all made. But just looking at the record, and when you have a record that also has a very mentally ill client who's very poorly educated, never been able to hold a job, it's unclear what he understood. Like, all the smart people in the courtroom, the well-educated judge, well-educated prosecutor, the very well-educated defense lawyer, well, they think something. But what is this poorly educated person who has a very low literacy level, and has extraordinarily little? Thank you. One last question. He has been consulted, and he wants to have the plea undone and to go back and possibly face trial. Oh, I've consulted him. And I am continuing to consult him. So he is making a reasoned decision to pursue this appeal, and knowing that the consequence is he would still be chargeable, or even charged, I'm not sure how we're going to figure this out, with the very crime that he previously pled guilty to. I've previously spoken to him, and I am now, I have a letter out to him discussing with him a little bit more. And after preparing for this argument, I'm going to try another one. I'm not trying to invade any attorney-client privilege. No, I understand. I just want to be confident that the defendant is the one choosing to pursue this appeal. So far. So far. But I've sent him a letter, and I'm going to send him another letter, resigned, where I discussed with him. Counsel, and I think that's what I was trying to get to with my earlier comment about your client. Things could be worse than a wrong date for your client, if we were to follow what you were advocating, which was vacating a conviction and sending the case back. Yes, ma'am. Counsel, counsel, if I may, please. You're at 18 minutes, and you have reserved time for rebuttal. We want to hear from your opponents. So you've advised us you'll send or have or will be sending a letter to your client. I take it if you receive instructions, otherwise you would let the government know and the court. But this court will proceed to take this case under advisement. All right? Thank you. We'll hear from you. You have reserved two minutes for rebuttal. Thank you. Thank you. To cut to the chase. Rather than address the issue of intent.